### ARIZONA MINERALS CORPORATION v. AMERICAN DOUCIL CO.

No. 9373.

Circuit Court of Appeals, Eighth Circuit.

July 13, 1932.

Frank A. Whiteley, of Minneapolis, Minn., for appellant.

Harvey Lechner, of Philadelphia, Pa. (Merchant & Kilgore, of Minneapolis, Minn., Arthur Synnestvedt and Paul Synnestvedt, both of Philadelphia, Pa., and F. D. Merchant, of Minneapolis, Minn., on the brief), for appellee.

Before STONE and KENYON, Circuit Judges, and OTIS, District Judge.

STONE, Circuit Judge.

Appellee herein brought an action against these appellants for infringement of letters patent No. 1,586,764, issued to Wheaton, covering a base exchange process and product for softening hard water. The defense was invalidity of the patent and noninfringement. The trial court sustained the patent with a very narrow scope, and found no infringement. On appeal to this court [36 F. (2d) 673] that decree was reversed, this court holding claim 7 invalid, typical claims 6 and 19 valid, with somewhat different restrictions than stated by the trial court, and claims 6 and 19 infringed. Thereafter one of the defendants changed the process. A supplemental complaint was filed charging the new process to be an infringement; the trial court decreed infringement, and that defendant brings this appeal therefrom.

The former opinion of this court in this litigation is a finality as to the validity of the typical claims 6 and 19 of the patent, leaving for determination here the sole question of infringement. As is usual in patent cases, one of the controlling factors in determining infringement is the scope to be given valid claims in a patent. The scope to be given these two typical claims in determining the matter of infringement now before us is so involved. On the former appeal, this scope was involved and determined, and that determination is binding now, in so far as it is applicable to the new process. Both parties recognize that this is true, and both parties recognize that the former opinion must be understood in the light of the situation and issues before the court in determination of which that opinion was written. Construing that opinion in the light of such situation and issues, the parties reach contrary results in the application of the teachings of that opin-

ion to the present situation. This condition of affairs, coupled with the fact that each of the parties makes constant comparison between the processes of defendants which were involved on the former appeal and the process now in question make it advisable, for a better understanding of the matter now before the court, to set out the three processes, namely, the process of plaintiff, the processes of defendants involved in the prior appeal, and the present process of this defendant. These processes and their relations to each other are better understood if there is a brief preliminary statement concerning the art. Therefore such preliminary statement will be made, followed by a concise outline of the above processes.

## The Art.

For many practical purposes, it has long been found desirable to soften naturally hard water. Water is hard because it contains lime and magnesia; therefore the efforts to soften water have taken the direction of the removal of those substances therefrom. Such removal involves chemical reactions which will result in the lime and magnesia being removed from the water as it flows through the removing agency. Such agencies are known as zeolites. Certain clays which have such properties are known as natural zeolites, but it has long been understood that zeolites could be created by certain chemical combinations which would produce better results, and such are known as synthetic zeolites. The manufacture of synthetic zeolites involves both chemical and physical considerations. The chemical problem is to produce a compound which will react to the hard water, taking up the lime and magnesia in exchange for some chemical, harmless in the uses to which the water will be put. Various chemical compounds have been tested, but it has long been known that a double compound made up of sodium aluminate and sodium silicate satisfactorily meets the chemical requirements of exchange, since it results in taking up the lime and magnesia in exchange for sodium, which is harmless in the treated water, and since a simple washing of such an agent in salt water will restore it when use has lessened its efficiency as an exchange medium. The physical problems of a synthetic zeolite are insolubility, hardness, and maximum of surface exposure to the water to be softened. It has long been known that a compound of sodium aluminate and sodium silicate could be worked out into a zeolite with not only the requisite chemical, but also the necessary physical characteristics.

Two general ways of producing these synthetic zeolites have been employed. The earlier and less satisfactory method was by fusing the chemicals, and this is known as the "dry" method. The more modern and efficient procedure is to mix solutions of sodium aluminate and sodium silicate. This is known as the "wet" method. Having in mind the physical qualities either necessary or desirable in a zeolite, it is evident that the wet method involves the ultimate creation from solutions of a dry, hard solid with accentuated surface exposure. All methods to accomplish such results involve mixing of the solutions to obtain the double compound in some solid form, the drying of that compound to the proper stage by the removal of excess moisture, the breaking up of the dried solids into usable sizes, and the washing therefrom of excess soluble matter (always present) not integrally incorporated into the solids by the chemical reaction. Prior to Wheaton, the art shows many experimentations to produce the desired result by the wet process. It was early demonstrated that a mixture of solutions of sodium aluminate and sodium silicate would result in the formation of a gelatinous substance, and that the consistency of this substance might be made to range from a very thin precipitate to a very stiff solid gel having no supernatant (unincorporated) mother liquor. The consistency of this gelatinous substance depended, at its various stages, upon the strength and relative proportion of the solutions, the conditions of mixing and the methods of treatment, nearly always, the purpose being to create an aggregated or a consistent jellied mass which could be dried out to the proper stage. Also it was well known that such gel mass would contain mother liquor (confined or unconfined) carrying soluble salts, and that such of the salts as adhered to the dried structure must be removed by washing. Since the controversy here does not concern the processes used to break up and wash the dried gel, nothing need be said beyond the step of drying except to note that there were regular progressive and successive steps necessary by the wet method, beginning with the creation of the solutions and ending with the finished product—these steps being, generally, the creation of the separate solution, mixing of the solutions, formation of the gel, drying of the gel, breaking up of the dried gel mass or particles, and washing out of the soluble salts. It is those steps which were referred to in the former opinion when this court said that the Wheaton process was "a mere combination of steps, all of which were old in the field."

### The Processes of the Parties.

The Wheaton process, as practiced under the teachings of the patent, involved the use of solutions of sodium aluminate and sodium silicate of such strength that a mixing thereof would result, within a minute or two, in the formation of a complete gel incorporating all of the mother liquor and stiff enough to stand without support. These solutions were poured into and mixed in a shallow tray from which the sides were removed as soon as the stiff gel formed. This gel was then gently dried in a current of warm air until it had reached the proper stage of dryness; that stage being when it had "become hard," at which time it has reached what is known as the "decrepitation" stage.

The two processes used by defendants which were before this court on the former appeal were as follows: They have mixed solutions of sodium silicate and sodium aluminate of completely gelatinizing strengths, so as to obtain a stiff or solid gel, embracing substantially all of the constituents of the mixture, and this gel would retain its form when placed on the tray. In this manufacture, instead of allowing a block or slab of the gel to dry completely in the form in which it was poured, the appellees introduced into the mass, before it had dried, a metallic grid-like instrument. This grid was pushed down into the soft, but fixed, gel structure, so as to divide the slabs into small cuboid forms. In a later process, instead of waiting until the gel had finally set before introducing the grid, the gel was poured out into trays while it was still in process of formation, leveled down somewhat, and the grid then inserted. The grid, in either case, is soon withdrawn. One result of the process is to allow contact of the air more freely to the mass through the spaces where the grid has been placed, thus facilitating drying.

The method of defendant involved in the present appeal is as follows: Solutions of sodium silicate and sodium aluminate are prepared in separate tanks where they can be discharged through large ports into a mixing tank. These solutions are of such concentration that, if they were mixed and not stirred, they would solidify into a complete gel embracing all of the materials in such mixture. Instead of mixing the two solutions alone and leaving them undisturbed, they are precipitated through the ports into a mixing tank which contains a considerable proportion of water which is, at that time, in violent agitation by means of a centrifugal pump, which keeps recirculating the liquid from the tank through the pump, and back again, over and over again. This mixture gradually becomes thicker so that at one stage it is a very heavy mixture which is very difficult for the pump to carry, and, had less water been used, the whole mass would solidify into a jelly and stop the pump. However, the right amount of water has been calculated so that, working in that amount of water (which is much more than that used in the Wheaton mixture), the mass in the mixing tank does not solidify, although it almost reaches that point at one stage. As the circulation in the mixing tank is constantly continued by the pump, the mass, which has become thickened, then thins out into a thin mush, which contains about 5 per cent. of solids and 95 per cent. of water. This thin mush is then pumped, by means of a centrifugal pump, from the mixing tank some three hundred feet into the storage tank, which is about ten feet high and thirty feet in diameter. In the storage tank the gel particles or fragments in the mixture slump down, leaving about 10 per cent. of the total contents of the mixture as a clear liquor on top. The storage tank is provided with a system of pipes underneath in which there are about 50 outlets for the material in the tank. The centrifugal pump connected with these pipes draws the substance in the tank through these openings and delivers it through a three-inch pipe to a three-inch fire hose, from the end of which it is sprayed upon the drying platform. This platform is of concrete about three hundred feet long and one hundred feet wide, divided lengthwise into strips of concrete about nine or ten feet wide. After a certain quantity is sprayed upon the platform, the spraying stops, and the operator levels the mush in these strips by a raised board, to which a handle is attached. This board is so regulated that the leveled mixture is about an inch and a half deep. This method of pumping results in a very good mixture of the gel fragments throughout the mother liquor. When the mixture gets too thick for this pump to handle readily, the operation of the pump is reversed, and the material is blown back into the storage tank, producing a stirring up and mixing of the material within that tank. On the material, as smoothed out on the drying platform, there is, at first, a "shimmering surface," due to the supernatant liquid above the gel fragments, which slowly settles. This entire operation is carried on in the open air during the warm months at Yuma, Ariz. As natural evaporation proceeds, the supernatant liquid disappears, and the material gradually becomes thicker and harder. When it

has evaporated to about the consistency of butter, a rake, with teeth about two and one-half or three inches apart, is drawn through the mass, thus forming parallel grooves the full length of the platform run. The purpose of this raking is to assist in the proper cracking up of the material as the drying proceeds, thus, producing pieces of virtually uniform size. The natural evaporation then proceeds until the mass passes through a gradually hardening gel stage and reaches the point of decrepitation.

## Prior Opinion.

From what has been said above as to the state of the art, and as to the processes employed by plaintiff and defendants, it is evident, as stated in the prior opinion, that the production of synthetic zeolites by the wet method involves a succession of steps beginning with the creation of the solutions and ending with the finished zeolite. Also it is evident that the matter of infringement here depends upon what takes place in those steps up to the formation of a stiff gel. Therefore our examination of the prior opinion will be directed to what was said therein concerning the scope of the patent, as to the formation of the stiff gel.

On the former appeal defendants, besides attacking the validity of the patent, urged that, if it were valid, it should be narrowly limited to the exact process described in the patent. The limitations insisted upon were that the percentage of the aluminate solution was limited to between 6 to 16 per cent. of alumina, that there was a temperature limitation upon the mixture of not exceeding twenty degrees centigrade, and that all of the mother liquor of the mixture was retained in the stiff gel formation until withdrawn by evaporation alone. If the patent were thus restricted, defendants denied infringement, because they claimed to use a different strength of aluminate solution to mix at a different temperature, and to extract from the gel an appreciable amount of the mother liquor by drainage and pressure, instead of using only evaporation. The issues so presented were clearly determined in the prior opinion, as follows. Claims 6 and 19 were held valid, but the court stated that they "should be narrowly construed, as the process is a mere combination of steps, all of which were old in the field." In defining this narrow construction, as related to the issues before it, the court determined: (1) That the patent did not cover either all mixtures of the double silicate and sodium aluminate, or

all such as would produce a stiff gel, because use of this double silicate had been known in the art since 1852, and the formation of a stiff gel therefrom was shown by De Brunn (No. 1,161,200), Rudorf (No. 1,304,206), Massatsch (No. 1,343,927), and Boehringer and Gessler (No. 1,050,204); (2) that there was no limitation in the patent as to precise strength of solutions, nor as to temperatures of mixing, except that such solutions should be completely gelatinizing strength and the temperatures such as to produce a stiff gel quickly; (3) that the restriction was such that "the gel produced shall retain all of the mother liquor fixed within the gel structure, so that the soluble salts are retained until the gel assumes its rigid form as a gel"; (4) that the processes of defendants there under consideration involved mixtures of completely gelatinizing strengths which acted to form a stiff gel, and, while they wasted some portions of the gel mixture by pouring and use of the grids, there was no substantial departure from the patent "as to the portion of the gel that is undisturbed by the grid," which was the "greater portions" of the mixture or gel and constituted the part from which the zeolites were made.

The opinion states that the limitation placed therein upon the patent, that it was confined to a gel which would retain within its structure all of the mother liquor, was based upon the prior art and upon the express disclaimer made by the patentee. The prior art intended showed many mixtures of sodium silicate and sodium aluminate solutions which produced gels, most of which were more diluted than those necessarily employed by plaintiff to produce the incorporation of all the mother liquor in a stiff gel. The opinion directly mentions the teachings of the Boehringer and Gessler patent to be a mixture in a dilute solution producing a gel stiff enough to hold a stick in a fixed position. The disclaimer in the patent is quoted in the opinion as being "any process in which a precipitate in a liquid is produced, the process of this invention producing a homogeneous stiff gel, into which the whole mass of the mixed liquids, sets, this gel being of uniform consistency in which the whole of the water present is held dispersed and fixed throughout the gel-structure."

## Infringement.

The determination as to infringement of the present process of this defendant depends upon a comparison of the substance of that process with the one protected in the patent

as above limited in the prior opinion. It will aid to state the contentions of the parties. Defendant contends that the Wheaton process calls for the formation of a complete gel upon mixture of the solutions, which gel remains undisturbed from formation throughout the drying process to decrepitation, while its process forms a gel precipitate made up of a mass of gell particles suspended in, and settling through, a surplus of mother liquor, which surplus is never incorporated in the gel structure, and which becomes supernatant if undisturbed, and that its process results in a different product, in the sense that it has an increased exchange capacity. Plaintiff contends that the Wheaton process is the use of the two solutions in such strengths as to obtain a complete (stiff or solid) gel, which retains the soluble salts in the structure as formative agencies of the structure, that this structural formation, so brought about, is the essence of the Wheaton process, and that this defendant uses the same materials, ultimately arrives at the same gel with all of the structure forming soluble salts therein, and that the only differences between the two processes are inconsequential ones occurring prior to formation of the complete gel, and having to do only with manufacturing convenience. in getting the material onto the drying platforms (that is, the mixture is kept in a fluid condition merely so it can be pumped onto the platform, thus constituting simply a delay in formation of the stiff gel until after the mixture can be placed on the platform), and that the zeolite produced is the same as that under the Wheaton process.

As said above, it is quite evident that each of these processes results, at one stage therein, in a stiff, firm gel, the difference being that plaintiff contemplates a practically immediate formation of this gel upon mixture of the two solutions, while defendant delays the formation of this stiff gel until after the mixture has been placed upon the drying platform. A comparison of the teachings of the Wheaton patent, as defined in the former opinion, with the new process employed by this defendant, reveals differences which are convincing to us that the new process is no infringement of that patent. Such comparison reveals the vital differences following:

The Wheaton process contemplated the use of solutions of such strength that a mixing thereof would form a stiff, self-sustaining jelly within a very few minutes. It contemplated that this jelly would be so formed, and that it would retain this formation undisturbed throughout the drying period until the stage of decrepitation had been reached. The purpose of Wheaton in so doing was to cause a physical formation of the gel as a highly porous structure, effected through the incorporation therein of all, or substantially all, of the mother liquor of the mixture. It is the retention of all of this mother liquor (soluble salts), in the gel so formed, which is one of the essential features of the Wheaton patent. The gel so procured is established before the drying step is begun. On the other hand, this defendant, by the introduction of water at the time of mixture, and by the violent agitation during mixing, prevents the formation of this stiff gel. In fact, the formation of the gel at that stage would, absolutely, prevent its method of further handling the material. This added water and agitation not only prevents the formation of the stiff gel, but it produces a thin mushy substance which has no characteristics of firmness or stiffness, and has been well described, by plaintiff's main expert witness, as a sort of watery sludge or slurry. Instead of being a firm gel structure incorporating all of the mother liquor, it is a mushy material made up of tiny particles of gel distributed through a surplus of mother liquor, and these gel fragments are never permitted to reach a firm agglomeration or cohesion before the drying stage. In fact, without the drying stage, they would never reach the consistency of a stiff, firm gel. This latter fact is conclusively demonstrated by physical exhibits of this mixture which were introduced both by plaintiff and by defendant. These exhibits have been preserved in airtight glass containers, where the drying process would be substantially prevented. All of such exhibits, after being undisturbed for months since the trial, reveal a settling of solid matter below an appreciable quantity of clear liquid, and, upon slight shaking, the solid matter readily diffuses into the clear liquid which disappears. There can be no question that in defendant's process there is no approach to a consistent stiff gel prior to the drying stage. Even when the material is spread upon the drying platform, it has not lost its characteristics, and is, in no sense, a stiff gel. When spread on the drying platform to the depth of only about an inch and a half, it is still a mixture of mother liquor and gel fragments with a "shimmering surface, due to the supernatant liquid above the gel fragments." It is only during the course of drying that this shimmering surface disappears by evaporation, and, thus a substantial part of the moisture in the mother liquor

never enters into the gel structure. In a word, the two processes are that Wheaton immediately forms a firm gel structure, incorporating all of the mother liquor, and the drying is for the purpose of eliminating the proper amount of moisture in this imprisoned mother liquor, while defendant keeps its mixture in a semiliquid state, and the gel forms during the removal of moisture from this mushy material, a substantial portion of the mother liquor never being incorporated in the final gel structure.

Plaintiff argues that the present process of defendant is analogous to their old process, in that each is merely an interference with and a delaying of the formation of the stiff gel structure, and that the former opinion held such interference and delay in defendants' older processes did not avoid infringement. A comparison of the old processes of defendants and the new process of this defendant reveals marked differences. In the old processes, defendants used solutions of completely gelation strength. Immediately upon the mixing, the mixture was poured into the trays with the object of setting the grids during the few minutes before complete gelation. This entire transaction was carried out as speedily as possible. The loss of mother liquor through the pouring and the insertion of the grids was incidental, and this court recognized that such loss was more in the nature of a waste of mixture instead of a substantial interference with the formation of the gel which passed into the finished product. The major part of the mixture, with this slight and very brief disturbance, quickly passed into a stiff self-sustaining gel, which was completely formed before the drying process began. This court regarded such a method as being substantially that of the Wheaton patent, and we have no question as to the accuracy of that determination. The new method absolutely prevents, prior to the drying step, the formation of any self-sustaining gel in any part of the mixture, and so dilutes and manipulates the mixture as to create a material in the nature of a gelatinous precipitate made up of tiny gel particles distributed in a mass of mother liquor, which liquor is too great to be incorporated in the gel structure at any stage, and which prevents the formation, prior to the drying stage, of a self-sustaining gel mass from the gel particles. The new process is clearly within the disclaimer of the patent, and therefore clearly outside of the protection of the patent. This is not merely a matter of delayed formation of a firm gel. It is a different method of procuring such a gel.

Plaintiff urges that the product is the same. It is true that in each a stiff gel results and in each that gel eventually produces a synthetic zeolite. Even if these stiff gels and these zeolites were the same, it would not avail the plaintiff. While the Wheaton patent contains product claims, that patent came into a rather crowded art which had taught the production of this character of zeolite from gels made from the mixture of these same chemical solutions. The products of the prior art were of the same general chemical composition and of the same general physical properties; the difference between any of these products being the difference in exchange capacity. It can hardly be sustained that plaintiff has any patent upon a product of a certain exchange value. If this were true, then synthetic zeolites made by the dry method, but having the same exchange capacity as those produced by Wheaton, would be infringements. In this situation, it is clear that the product claims must be limited by the process claims. Obviously, the product claims of the patent have value only to protect products made in accordance with the teachings of the process claims. In connection with this point, it may be observed that the only direct evidence as to the exchange values of the two products seems to be that such value is definitely greater in the zeolite made by defendant.

### Conclusion.

Our conclusion is that the new process of this defendant is no infringement of the Wheaton patent, as construed in the former opinion of this court, and that the decree must be reversed, with instructions to set aside the decree and enter a decree dismissing plaintiff's supplemental complaint upon the merits.